UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 06-493(DSD/JJG)


Ingenix, Inc.,

       Plaintiff,

v.                                                                  **ORDER**

Todd Fessler and Brian C. Smith,

       Defendants.


      Charles C. Moore, Esq., Heather C. Toft, Esq., Robert R.
      Reinhart, Esq., Steven J. Wells, Esq. and Dorsey &
      Whitney, 50 South Sixth Street, Minneapolis, MN 55402,
      counsel for plaintiff.

      Barbara P. Berens, Esq. and Kelly & Berens, 80 South
      Eighth Street, Suite 3720, Minneapolis, MN 55402, counsel
      for defendants.


This matter came on for hearing on February 16, 2006, upon plaintiff's motion for a temporary restraining order. Plaintiff and defendants appeared through counsel. Based upon a review of the file, record and proceedings herein, and the arguments of counsel at the hearing, plaintiff's motion for a temporary restraining order is denied.


**BACKGROUND**

Plaintiff Ingenix, Inc., develops, markets and sells both products and services that are designed to offer healthcare

providers solutions to the maintenance and reliability of voluminous database information. Ingenix is a subsidiary of UnitedHealth Group, Inc., with headquarters in Minnesota and nation-wide operations. In May of 2001, Ingenix hired defendant Todd Fessler to be a regional sales director. At the time Fessler was hired, he had substantial sales experience in the healthcare industry. Throughout his Ingenix employment, Fessler lived in Michigan and worked out of his home office. In January of 2003, Ingenix hired defendant Brian Smith to be a director of sales. At the time Smith was hired, he had over twenty years of sales, marketing and consulting experience in the healthcare industry. Throughout Smith's employment, he lived in California and worked for Ingenix out of his home office.

Fessler and Smith were designated Ingenix customers throughout the United States. Their sales responsibilities were based upon their respective customers and not on geographical boundaries. Neither defendant signed a non-compete agreement or a non-solicitation agreement as a condition of their employment with Ingenix. Fessler and Smith were both very successful in their respective positions and generated significant revenue for Ingenix. Each attained the position of vice president of Ingenix's Strategic Accounts Group by 2005. As vice presidents, Fessler and Smith were responsible for the management of several Ingenix customer accounts throughout the United States.

In 2005, Ingenix instituted a new compensation plan, which included newly imposed caps on commissions and increased sales quotas. As an additional form of compensation, Ingenix awarded Fessler and Smith 250 stock options in UnitedHealth Group common stock in June of 2005.  Mike Cunningham, president of Ingenix's Strategic Accounts Group, told Smith and Fessler that the stock option grants were a significant and unprecedented award.  Bill Whitely, Ingenix's chief marketing officer, congratulated Fessler in a letter and indicated that the award was to reinforce Ingenix's "commitment to providing total compensation opportunities that reward and retain top talent." (Fessler Aff. Ex. 1.)  Richard Anderson, Ingenix's chief executive officer, also congratulated Fessler and Smith and stated that the option grants were to recognize their service to the company.  (See id. Ex. 2.) Ingenix's management team did not discuss with Fessler or Smith that accepting the options would require agreeing to several restrictive covenants contained in the stock option agreements.

Fessler and Smith each received an e-mail from UnitedHealth Group that contained a link to accept their stock options, which they electronically accepted.  Fessler accepted his stock options from his Michigan home office.  Smith accepted his options from his California home office.  Fessler and Smith claim that they did not read, nor were they required to read, the terms of the stock option agreements before electronically accepting their award of 250 stock

3

options.  They both claim that if they had been made aware of the nature of the restrictive covenants contained therein, they would not have accepted the options.

Each stock option agreement specifies that, in consideration for the options, the optionee agrees to be bound by three restrictive covenants.  (See Compl. Exs. 3-4.)  First, the optionee agrees not to disclose any of UnitedHealth Group's confidential or proprietary information.  Second, the optionee agrees not to compete with UnitedHealth Group anywhere in the United States for the greater of one year following termination of the optionee's employment or the period of time in which the options remain exercisable.  Third, the optionee agrees not to solicit any of UnitedHealth Group's employees, customers, or business relationships for the greater of two years following termination of employment or the period of time in which the options remain exercisable.  A forfeiture provision further specifies that if an optionee violates any of the restrictive covenants, the options are subject to forfeiture.

Smith and Fessler claim that they were never directly informed that accepting the stock options would result in, among other things, binding non-compete agreements.  Smith claims that at no time was he aware that the stock option agreements contained a non-compete clause.  Fessler, prior to accepting the stock options, became aware that the stock option agreements would contain a non-

compete clause based on conversations with other Ingenix employees. He thereafter inquired about the effect of the non-compete agreement and claims that the human resource department informed him that the only penalty for violation of the covenant was forfeiture of the stock options.

In May of 2005, prior to receiving the stock options, Fessler claims that he began to explore an employment opportunity with Enclarity, Inc. Enclarity is a start-up company that is focused on marketing a product and service designed to verify and correct healthcare provider data on an overnight basis. Fessler eventually appraised Smith of Enclarity. Ingenix claims that Fessler recruited Smith to pursue the Enclarity employment opportunity. Fessler and Smith directly refute that claim and state that Fessler approached Smith for his opinion on the Enclarity company and that Smith thereafter became interested in joining Enclarity on his own accord. Dissatisfied with the new Ingenix compensation plan, Fessler and Smith tendered their resignations to Ingenix and thereafter joined Enclarity's executive team. Their last day of Ingenix employment was January 27, 2006.

On February 3, 2006, Ingenix filed this action, alleging that Fessler and Smith have misappropriated Ingenix's proprietary and confidential information and have violated the terms of the non-compete and non-solicitation covenants contained in their

respective stock option agreements.[1]  Ingenix further alleges that Fessler and Smith have engaged in unfair competition and have intentionally interfered with Ingenix's prospective economic business relationships.  On February 7, 2006, Ingenix moved for a temporary restraining order to enjoin Fessler and Smith from continuing to violate the terms of their stock option agreements.


## DISCUSSION

### I.   Governing Law

The threshold issue before the court is which law should govern the resolution of the disputes.  Neither stock option agreement contains a choice-of-law provision.  Ingenix argues that Minnesota law should govern both stock option agreements.  Fessler has not argued the choice-of-law issue at this time.[2]  Smith argues that California law should govern the agreement he entered into because he is a California citizen and has resided in, and worked from, California for his entire period of Ingenix employment.

---

[1]  Plaintiff originally named Enclarity as a third defendant to this lawsuit.  However, because Enclarity and Ingenix are both Delaware corporations, Enclarity's presence in the lawsuit destroyed the court's subject matter jurisdiction for want of complete diversity of citizenship.  See U.S.C. § 1332(c); Owen Equip. & Erection v. Kroger, 437 U.S. 365, 373 (1978). Accordingly, Enclarity has been dismissed.

[2]  Fessler has reserved the right to submit further arguments on the choice-of-law issue but acknowledges that Michigan and Minnesota law do not appear to conflict as they relate to the enforceability of the covenants at issue.

A federal district court applies the choice-of-law rules of the state in which the court sits.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  Minnesota choice of law rules instruct the court to first consider whether there is an actual conflict between the laws of two forums.  Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co., 604 N.W.2d 91, 93-94 (Minn. 2000); Medtronic, Inc. v. Advanced Bionics Corp., 630 N.W.2d 438, 454 (Minn. Ct. App. 2001).  "A conflict exists if the choice of one forum's law over the other will determine the outcome of the case." Nodak Mut. Ins. Co., 604 N.W.2d at 94.  If the court finds that no conflict exists, then no choice-of-law issue exists.  Vetter v. Sec. Cont'l Ins. Co., 567 N.W.2d 516, 521-22 (Minn. 1997).

If the court finds that a conflict exists, the court must determine that each state has a significant contact to the matter so that selecting its choice of law would not be unconstitutional or fundamentally unfair.  Jepson v. Gen. Cas. Co. of Wis., 513 N.W.2d 467, 469 (Minn. 1994).  If application of either state's laws would be fair, the court must then balance the following five factors to determine which law shall govern resolution of the dispute: "(1) predictability of the result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law." Medtronic, 630 N.W.2d at 454.

As to the agreement entered into by Fessler, the court finds that there is no conflict between Minnesota law and Michigan law as to the enforceability of the restrictive covenants.  Under either state's law, a non-compete agreement that is reasonable in its scope and terms is enforceable to the extent that it is necessary to protect an employer's legitimate business interests.  <u>Compare</u> <u>Medtronic</u>, 630 N.W.2d at 454, <u>and</u> <u>Webb Publ'g Co. v. Fosshage</u>, 426 N.W.2d 445, 450 (Minn. Ct. App. 1988), <u>with</u> Mich. Comp. Laws § 445.774a, <u>and</u> <u>Bristol Window & Door, Inc. v. Hoogenstyn</u>, 650 N.W.2d 670 (Mich. Ct. App. 2002).  Because no conflict exists, the court need not engage in a choice-of-law analysis and will apply Minnesota law, the law of the forum.

As to the agreement entered into by Smith, the court finds that there is a conflict of law that would be determinative of the outcome of plaintiff's claims against Smith.  Unlike Minnesota law, California law generally renders non-compete agreements to be void as unlawful restraints on trade.  <u>See</u> Cal. Bus. & Prof. Code § 16600; <u>Hill Med. Corp. v. Wycoff</u>, 103 Cal. Rptr. 2d 779, 784 (Cal. Ct. App. 2001).  The court further finds that both Minnesota and California have sufficient contacts with the stock option agreement at issue and that application of either state's law would not be unconstitutional or fundamentally unfair.  <u>See</u> <u>Jepson</u>, 513 N.W.2d

at 469.  The court finds it unnecessary at this stage, however, to decide the choice-of-law issue because even if Minnesota law applies, a temporary restraining order is not warranted.

## II.  Temporary Restraining Order

The court considers four familiar factors in determining whether a temporary restraining order should issue: (1) is there a substantial threat that the movant will suffer irreparable harm if relief is not granted, (2) does the irreparable harm to movant outweigh any potential harm that granting a preliminary injunction may cause the non-moving parties, (3) is there a substantial probability that the movant will prevail on the merits and (4) what action is in the public interest.  Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc).  The court balances the equitable nature of all four factors to determine whether a temporary restraining order is warranted.  Id. at 113; Taylor Corp. v. Four Seasons Greetings, LLC, 315 F.3d 1039, 1041 (8th Cir. 2003).  Plaintiff has the burden to prove all factors. See Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003).

### A.   Irreparable Harm

Under Minnesota law, the court infers irreparable injury from the breach of a restrictive covenant if the employee was in contact with the employer's customers "in a way which obtains a personal hold on the good will of the business."  Webb Publ'g Co., 426 N.W.2d at 448.  Minnesota courts will infer irreparable harm when

9

the former employee is a sales person who begins to sell competing goods within the trade or actively solicits a former employer's customers.  Rosewood Mortgage Corp. v. Hefty, 383 N.W.2d 456, 459 (Minn. Ct. App. 1986) (citing Thermorama, Inc. v. Buckwold, 125 N.W.2d 844, 845 (Minn. 1964)).  A defendant may rebut the inference of irreparable harm by showing that he did not have a hold on either the business's good will or clientele.  Webb Publ'g Co., 426 N.W.2d at 448.

Ingenix alleges that Fessler and Smith were in executive sales positions that enabled them to obtain personal holds on Ingenix customers.  Ingenix further alleges that Fessler and Smith are in possession of confidential and proprietary information that they have disclosed to Enclarity.  Ingenix has shown that prior to leaving Ingenix, Fessler and Smith were involved in preparing Enclarity price proposals for an Ingenix client and developing Enclarity's promotional materials.  Further, Smith made his departure known to at least one Ingenix customer and recommended that the customer look into the opportunities available at Enclarity.  The court finds that, under Minnesota law, Ingenix has provided evidence sufficient to infer irreparable harm.

Fessler and Smith argue, however, that Ingenix is unable to establish irreparable harm at this time because Enclarity is a startup company that has no clients or revenue.  Fessler and Smith further argue that the products and services offered by Enclarity

do not directly compete with those offered by Ingenix.  As to their possession of confidential or proprietary information, Fessler and Smith claim that they have returned all such information to Ingenix prior to their departure.  The court finds that the record is not clear, and the parties wholly disagree, as to the degree to which Enclarity's products and services directly compete with those of Ingenix.  The court also finds that Ingenix's allegations that Fessler and Smith are in possession of, and have disclosed, proprietary or confidential information are presently speculative in nature.  Therefore, the court finds that the factor of irreparable harm does not weigh strongly in plaintiff's favor.

**B.  Balance of Harms**

The court must next consider whether any irreparable harm to the movant outweighs any potential harm to the non-movant should the restraining order issue.  See Dataphase, 640 F.2d at 114.  The court finds that issuing a restraining order at this time would unnecessarily and severely restrict Fessler and Smith from engaging in their chosen professions.  The court has considered Smith and Fessler's extensive employment and connections in the healthcare sales industry prior to being hired by Ingenix.  The court has also considered the present disparity between Ingenix and Enclarity.  Ingenix is an established company with a national clientele that serves over 1,500 payers of claims, 200,000 physicians or healthcare providers, 3,500 hospitals and 100 Fortune 500

companies.   (Whitely Aff. ¶ 3.)   Enclarity is a startup company
with zero clients and zero revenue. (Downs Aff. ¶ 3.)   Therefore,
given the totality of the circumstances, the court finds that the
balance of harms presently tips in favor of Fessler and Smith and
against the issuance of a temporary restraining order.

>    **C.   Likelihood of Success on the Merits**

The court next evaluates the likelihood that Ingenix will
prevail on the merits.   <u>See</u> <u>Dataphase</u>, 640 F.2d at 113.   When the
chance of irreparable injury to the moving party is outweighed by
the likely injury to the other parties, the moving party "faces a
heavy burden of demonstrating that he is likely to prevail on the
merits."   <u>Id.</u>   Minnesota courts look upon non-compete agreements
"with disfavor and scrutinize them with care."[3]   <u>Freeman v. Duluth</u>
<u>Clinic, Inc.</u>, 334 N.W.2d 626, 630 (Minn. 1983).   To be enforceable,
a   non-compete   agreement   must   be   supported   by   adequate
consideration, be reasonable in the scope of its restrictive terms,
and serve a legitimate interest of the employer.   <u>Webb Publ'g Co.</u>,
426 N.W.2d at 450.   If the court finds an otherwise enforceable
non-compete agreement to be overly broad or unreasonable in its

_____

    [3]   The court notes that Ingenix's likelihood of enforcing the
restrictive covenants contained in Smith's stock option agreement
depends, in large part, on the application of Minnesota law and not
California law.

12

terms, Minnesota law allows the court to modify the contract to comport with the law.  Hilligoss v. Cargill, Inc., 649 N.W.2d 142, 147 n.8 (Minn. 2002).

Fessler and Smith have asserted a variety of legal defenses and factual allegations which, if proved, may seriously undermine the enforceability of the restrictive covenants contained in the stock option agreements.  They first argue that the promises contained in the stock option agreements are illusory in nature because the options did not begin to vest until May 2, 2006.  See Olander v. Compass Bank, 363 F.3d 560, 565 (5th Cir. 2004). Fessler and Smith further argue that the overly broad scope of the non-compete clauses renders them unenforceable and unreasonable restraints on competition.  See Webb Publ'g Co., 426 N.W.2d at 450. Fessler and Smith also argue that the purpose of the non-compete clauses, which were within stock option agreements, was not tailored to suit a legitimate business purpose.  See Laidlaw, Inc. v. Student Transp. of Am., 20 F. Supp.2d 727, 763 (D.N.J. 1998). Fessler and Smith assert that neither of them were aware, nor was it ever discussed, that electronically accepting their award of 250 stock options was in consideration for entering into binding non-compete agreements.  The court finds that Ingenix has not met its burden, at this stage, to demonstrate a substantial probability that it will prevail on the merits.  Therefore, this factor weighs against granting a temporary restraining order.

### 4.   Public Interest

Lastly, the court considers the public interest. <u>See</u> <u>Dataphase</u>, 640 F.2d at 114. The public interest favors the enforcement of valid non-compete agreements. <u>See</u> <u>N.I.S. Corp.</u>, 724 F.2d at 710. However, if Fessler and Smith establish their defenses to the validity of the agreements, the public interest would favor promoting competition. <u>See</u> <u>Benfield, Inc. v. Moline</u>, 351 F. Supp. 2d 911, 919 (D. Minn. 2004) ("[T]he public interest favors both enforcing contracts and promoting competition."). The question of the agreements' validity requires further factual development, for which the court declines to speculate. Therefore, the court finds that at this time public policy weighs in favor of denying the motion for the temporary restraining order.

Having considered all the factors, the court finds that the "extraordinary remedy" of a temporary restraining order should not issue. <u>See</u> <u>Watkins</u>, 346 F.3d at 844.

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that plaintiff's motion for a temporary restraining order [Doc. No. 15] is denied.

Dated:  February 24, 2006

s/David S. Doty
David S. Doty, Judge
United States District Court